ORIGINAL

1 | Robert W. Pommer III (Trial Counsel) (DC Bar No. 448803)
(Pommerr@sec.gov)
2 | Cheryl J. Scarboro
Charles J. Felker
3 | James Lee Buck, II
Ricky Sachar                    E-filing
4
Attorneys for Plaintiff
5 | SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
6 | Washington, DC 20549-4030
Telephone: (202) 551-4479
7 | Facsimile: (202) 772-9245

8

10                         UNITED STATES DISTRICT COURT

11                    NORTHERN DISTRICT OF CALIFORNIA

12                         SAN FRANCISCO DIVISION

13
14 | SECURITIES AND EXCHANGE COMMISSION,      Case No. _____ 6178      **SI**

15 |            Plaintiff,
                                             COMPLAINT
16 |     vs.

17 | SIDNEY MONDSCHEIN,                       DEMAND FOR JURY TRIAL

18 |            Defendant,

19 |     and

20 | UNCI, Inc.,

21 |            Relief Defendant.

22

23 | Plaintiff Securities and Exchange Commission ("Commission") alleges:

24 |                      **SUMMARY OF THE ACTION**

25 |     1.     This is a securities fraud and brokerage customer privacy case. Sidney Mondschein, a

26 | former Castro Valley, California broker, reaped illegal profits by secretly selling the names and other

27 | confidential personal information of his elderly customers to insurance agents across the country.

28 | Mondschein sold this information as sales "leads" solely to enable the insurance agents to solicit

COMPLAINT

1  these customers, many of whom had already purchased fixed or equity-indexed annuity products, to

2  buy additional annuity products. Over a three-and-a-half year period, Mondschein sold over 500

3  leads to six different insurance agents. Virtually all of Mondschein's customers were senior citizens.

4      2.      Mondschein never disclosed to any of these customers that he intended to sell, and did

5  sell, their confidential personal information to insurance agents. Indeed, in brokerage account

6  application forms and other required privacy disclosures, Mondschein and his broker-dealer firm

7  promised to maintain the confidentiality of personal information provided by the customer.

8  Moreover, Mondschein affirmatively misled his customers as to the nature of his compensation

9  arrangements and relationships with the various insurance agents.

10      3.      Mondschein purposefully concealed his leads selling business from his broker-dealer

11  firm and his broker-dealer regulator, the National Association of Securities Dealers. To facilitate his

12  fraudulent scheme, Mondschein created a separate entity, called UNCI, Inc., to market insurance

13  leads, collect leads fees, and participate in the commissions that those leads generated. In creating

14  this illicit business, Mondschein purposefully concealed that he, and he alone, fully controlled UNCI.

15      4.      In contravention of the policies of his broker-dealer firm, Mondschein never disclosed

16  UNCI's existence to his firm. For example, in required compliance questionnaires, Mondschein

17  affirmatively misrepresented the nature of his outside business activities. In addition, Mondschein

18  failed to disclose the existence of UNCI to the NASD on his Form U-4, which is a broker registration

19  document that requires a broker to disclose, among other things, all outside business activities.

20      5.      All of the "leads" that Mondschein sold were customers who previously used

21  Mondschein to sell securities or other assets to fund the purchase of annuities. Thus, Mondschein

22  believed that these leads presented marketing opportunities for new insurance agents to sell additional

23  annuity products to the leads.

24      6.      The confidential personal information Mondschein sold to insurance agents included,

25  at a minimum, the customer's name, address, phone number, and in certain instances, the dollar

26  amount the customer invested in a previous annuity, the insurance company that issued the previous

27  annuity, the agent who sold the customer the previous annuity, and the date of the annuity sale.

28

COMPLAINT                                -2-

7.     In exchange for the leads, the insurance agents compensated Mondschein on either a price-per-lead basis (ranging between $50 to $150 per lead) or, in at least two instances, by paying Mondschein a two percent kickback of the total amount that the lead invested in a new annuity. Mondschein further collected brokerage commissions from those leads who subsequently purchased new annuities and used Mondschein to sell securities to fund the purchases. In such cases, Mondschein reaped illegal profits on both ends of the round trip transactions.

8.     Over the course of his numerous years as a broker, Mondschein developed an extensive "securities liquidation business" that he marketed exclusively to insurance agents. Mondschein had longstanding relationships with insurance agents across the country who recommended to their clients that they purchase annuity products and fund those purchases by selling securities. To liquidate the securities, the insurance agents recommended to their clients that they use Mondschein, instead of their existing broker. Mondschein in turn promised the insurance agents speedy transfer and liquidation services to help close more annuity sales.

9.     Mondschein's securities liquidation business was quite lucrative. He collected substantial brokerage commissions and other fees for selling the securities of elderly persons to fund their annuity purchases. In the process, Mondschein developed an extensive customer database that he secretly maintained to facilitate the leads-selling scheme. Thus, not only did he pocket the brokerage commissions when first providing liquidation services; Mondschein kept the customer's personal information as a potential lead to be sold at a later time to another insurance agent.

10.     Ultimately, Mondschein's leads-selling scheme unraveled. After learning of the Commission's investigation into his securities liquidation business, Mondschein attempted to dissolve UNCI by a board resolution on March 30, 2006. Those efforts, however, proved unsuccessful as UNCI failed to make the required filings with the State of California and engage in the necessary steps to wind down the corporation.

11.     As a result of his conduct, Mondschein violated Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5], and aided and abetted his Texas broker-dealer firm's violations of Rules 4(a), 5(a), and 10(a)(1) of Regulation S-P [17 C.F.R. §§ 248.4(a), 248.5(a) and 248.10(a)(1)]

COMPLAINT                                          -3-

1    **JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT**

2    12.    The Commission brings this action pursuant to Sections 21(d) and 21(e) of the

3    Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)]. This Court has jurisdiction over this action pursuant

4    to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

5    13.    Defendant Mondschein, directly or indirectly, made use of the means and

6    instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities

7    exchange in connection with the acts, practices, and courses of business alleged herein.

8    14.    Venue in this district is proper pursuant to Section 27 of the Exchange Act [15 U.S.C.

9    § 78aa] because defendant Mondschein resides in, and a substantial portion of the conduct alleged in

10    this complaint occurred within, the Northern District of California.

11    15.    Assignment to the San Francisco Division of this Court is proper because a substantial

12    part of the events or omissions that give rise to claims alleged in this complaint occurred in Alameda

13    and Contra Costa counties. In addition, defendant Mondschein resides in Alameda County, and relief

14    defendant UNCI, Inc. is based in Alameda County.

15    **DEFENDANT**

16    16.    Sidney Mondschein, age 51 of Castro Valley, California, formerly served as a

17    registered representative of WFG Investments, Inc. (formerly known as the (Wilson) Williams

18    Financial Group), the Texas broker-dealer firm referenced in this complaint. Mondschein was the

19    branch manager of WFG's Antioch, California office from April 2000 through July 31, 2006, when

20    he was terminated by WFG through mutual agreement. During the Commission's investigation,

21    Mondschein asserted his Fifth Amendment right against self-incrimination and refused to answer the

22    Commission staff's questions about the events alleged in this complaint.

23    **RELIEF DEFENDANT**

24    17.    UNCI, Inc. is a California corporation that Mondschein established in October 2002.

25    UNCI's registered office is Mondschein's former residence in San Leandro, California. UNCI's

26    officers and directors consist only of Mondschein's wife (who has a different last name from

27    Mondschein). At all times, Mondschein fully controlled UNCI. His wife, who had signature

28

COMPLAINT                    -4-

1 | authority over UNCI's bank account, undertook UNCI-related actions pursuant only to Mondschein's
2 | instruction.

3 |     18.    A corporate board resolution, dated March 30, 2006 and signed by Mondschein's wife,
4 | purportedly dissolved UNCI as a corporation. However, UNCI failed to make the required filings
5 | with the State of California and engage in the necessary steps to wind down the corporation. The
6 | official records of the State of California currently list the corporate status of UNCI as "active," with
7 | Mondschein's wife as the registered agent for service of process.

8 |     19.    During the investigation, the Commission issued subpoenas to UNCI, Mondschein,
9 | and his wife seeking information identifying "the nature of UNCI's business." The response, which
10 | was submitted in writing by counsel, stated: "The nature of UNCI's business was to provide basic
11 | administrative support services and to develop insurance marketing leads and participate in the
12 | commission that those leads generated."

13 |     20.    As set forth in this complaint, Relief Defendant UNCI received and possesses money
14 | or other assets through defendant Mondschein's scheme and has no legitimate claim to them.

15 | **FACTUAL ALLEGATIONS**

16 | *I.*    ***Mondschein Operated a Securities Liquidation Business***

17 |     *A.*    ***Insurance Agents Solicit Elderly Persons to Buy Annuities***

18 |     21.    Throughout the country, insurance agents solicit elderly persons to purchase a variety
19 | of insurance products, including annuities.

20 |     22.    In many instances, insurance agents solicit the purchase of these products in
21 | connection with estate planning seminars and/or "Free Dinners" or lunches offered to elderly persons.

22 |     23.    In order to complete the sale of an annuity to an elderly person, the insurance agent
23 | frequently needs to make arrangements for that person to sell their securities or other assets to fund
24 | the annuity purchases.

25 |     24.    Mondschein, as a registered securities broker, marketed himself to insurance agents as
26 | a "securities liquidator" – that is, as someone who could quickly sell the insurance agent's elderly
27 | clients' securities or other assets to fund an annuity purchase.

28 |

### B.   *Mondschein's Securities Liquidation Business*

25.   From at least 1997 through July 2006, Mondschein derived virtually all of his income from operating a securities liquidation business. Mondschein's income came in the form of brokerage commissions that he earned by selling elderly persons' securities to fund their annuity purchases.

26.   Mondschein had few, if any, traditional retail broker-dealer customers as part of his overall brokerage practice. Rather, Mondschein made virtually his entire living from his securities liquidation business. In fact, this business was quite lucrative. In 2005, for example, Mondschein received nearly $1 million in brokerage commissions in connection with his securities liquidation business.

27.   Mondschein principally developed his securities liquidation business by promising the insurance agents – in appearances at industry gatherings and through word-of-mouth – speedy transfer and liquidation services.

28.   Mondschein promised the insurance agents that they would close five times as much business if they used his securities liquidation services, as opposed to having the insurance agents' annuity clients use their existing broker to sell securities to fund annuity purchases. Mondschein explained that the elderly persons' existing brokers likely would try to talk them out of liquidating their securities to buy an annuity.

29.   Mondschein's securities liquidation business was wholly dependent upon insurance agents referring their clients to Mondschein. To obtain customers, Mondschein relied on insurance agents to recommend to their clients that they transfer their brokerage accounts or other assets to Mondschein, who would then provide the securities liquidation services. Thus, over the at least nine years in which he operated such business, Mondschein cultivated close relationships with a network of insurance agents across the country.

30.   To facilitate his retention as securities liquidator, Mondschein prepared, and provided the insurance agents with, all of the necessary account application forms for the insurance agents to provide to their annuity clients. The insurance agents, in turn, recommended Mondschein's liquidation services as part of their sales pitch to their elderly annuity clients.

COMPLAINT                                                    -6-

31.     The account application materials – packets of paperwork tailored to the specific type of liquidation transaction – consisted of standardized forms that were to be used to effectuate the transfer, and ultimate sale, of the insurance agents' annuity clients' securities holdings or other assets. There were essentially two types of transactions. Mondschein either (i) received the elderly persons' brokerage accounts from their existing brokerage firm and then liquidated securities, or (ii) provided a signature guarantee on certain assets that the elderly person held directly, such as stock certificates, mutual fund shares, and existing annuities.

32.     The application packets contained a variety of documents, including brokerage-account opening forms, tax identification forms, account applications, customer information sheets, and similar documents. Customers were required to provide Mondschein with a wide variety of confidential personal information – such as their name, address, telephone number, and Social Security number. Mondschein required that his customers complete this paperwork prior to his liquidation of their securities or other assets.

33.     The application packets included representations that Mondschein and his broker-dealer firm would maintain the confidentiality of personal information provided by the customer. The packets also contained disclosures regarding the nature of Mondschein's relationship with the referring insurance agent. Among other things, the packets stated that the insurance agents were not in any way affiliated with Mondschein or his broker-dealer firm and that no fees or payments of any kind would be paid or received by or between Mondschein and the insurance agent.

34.     Mondschein's securities liquidation customers did not seek his services due to any special purpose or skill that he possessed. Simply, Mondschein's securities liquidation customers used his services primarily because their insurance agents told them to do so.

35.     The application packets, however, were written in a way to make the transaction appear to be unsolicited. For example, each application packet required the liquidation customer to represent, and acknowledge by initialing, the following: "I acknowledge that Williams Financial Group and Sidney Mondschein have **NOT SOLICITED** me nor have they made any recommendations concerning my investment decision to liquidate my portfolio . . . ."

36.     Mondschein essentially operated his securities liquidation business in the same manner throughout his nine years as a broker.

**II.     *Mondschein Sold His Customers' Confidential Personal Information as Sales "Leads"***

    **A.     *Mondschein Created a Customer Database and Established UNCI to Market Insurance Leads to his Network of Insurance Agents***

37.     Mondschein had a longstanding practice of retaining the confidential personal information of his securities liquidation customers. He knew that such information could be sold in the future to other insurance agents. He further knew that the practice of buying sales leads is common in the insurance industry.

38.     In October 2002, Mondschein established a California corporation, to which he gave the name UNCI, Inc. The nature of UNCI's business was to "develop insurance marketing leads and participate in the commission that those leads generated."

39.     Mondschein opened a bank account for UNCI, over which he gave his wife sole signature authority. In the incorporation documents filed with the State of California, Mondschein designated his home as UNCI's registered office and his wife as UNCI's chief executive officer, corporate secretary, chief financial officer, agent for service of process, and sole director. Mondschein described UNCI's business as "insurance marketing."

40.     Mondschein's wife has a different last name, and therefore no one who researched the company would suspect that UNCI was affiliated with Mondschein.

41.     Although his name did not appear in UNCI's organizing documents or on its bank account, Mondschein secretly directed and controlled UNCI at all times. For example, Mondschein's wife signed checks for UNCI only at Mondschein's instruction. In fact, in many instances, Mondschein presented for his wife's signature UNCI checks that he had already filled out.

42.     In addition to establishing UNCI, Mondschein also created and maintained an electronic database, in Microsoft Excel format, containing his customers' confidential personal information. For the period July 2002 to July 2005, Mondschein's electronic database listed specific information about approximately 18,000 different securities liquidation transactions.

43.   Mondschein's electronic database contained a wide variety of confidential personal information on each transaction, such as the customer's name, address, telephone number, and Social Security number. The database also contained information on the specific details of the customer's annuity-purchase transactions, including the insurance agent who sold the annuity and the insurance company issuing that annuity.

**B.   *Mondschein's Specific "Leads" Sales to Insurance Agencies***

44.   By December 2002, Mondschein began to use UNCI and his customer database to sell to insurance agents, as "leads," confidential personal information of his customers. Mondschein selected the leads solely based on the geographic location of the insurance agent who purchased the leads.

45.   Mondschein made these leads sales solely so that the insurance agents could solicit the leads to purchase additional annuities. The leads could purchase a new annuity by either selling additional securities or other assets, or by selling the original annuity they purchased for a new one. If these leads proved to be successful, Mondschein stood to make additional amounts in brokerage commissions for any securities liquidation services he might provide.

46.   All of these leads payments came from insurance agents with whom Mondschein had already established securities-liquidation referral relationships. However, none of these agents were affiliated with, controlling, controlled by, or under common control with, Mondschein or WFG.

47.   From December 2002 through at least August 2005, Mondschein sold over 500 leads in eight separate transactions, involving six different insurance agencies. Mondschein reaped at least $49,000 in illegal fees in selling his customers' confidential personal information. In addition, Mondschein reaped at least $4,000 in brokerage commissions when two of the leads sold securities held with Mondschein in their respective WFG brokerage accounts.

**1.   *December 2002 Sale of "Leads" to the Abio Financial Group***

48.   In December 2002, Mondschein sold the confidential personal information of 200 of his customers to the Abio Financial Group, a Texas-based insurance agency. Abio Financial held licenses to sell insurance products in several states, including Florida.

COMPLAINT                                    -9-

1    49.    In exchange for $10,000, Mondschein provided Abio Financial with the names,

2    addresses, and phone numbers of 200 Florida residents for whom Mondschein previously had

3    provided securities liquidation services.

4    50.    To conceal the transaction from WFG, Mondschein instructed Abio Financial to make

5    the check payable to UNCI. Mondschein issued a UNCI invoice for the transaction, which stated that

6    Abio Financial was purchasing 200 "Florida leads," at a rate of $50 per lead, for a total of $10,000.

7    51.    Abio Financial paid for this confidential personal information via a $10,000 check to

8    UNCI, which was deposited by UNCI on December 9, 2002. The memo line of the check describes

9    the payment as being for "Leads."

10    52.    As it turns out, one lead proved successful. In January 2003, Abio Financial sold two

11    annuities totaling approximately $85,000 to a female Florida-based septuagenarian. Mondschein

12    originally provided securities liquidation services to the septuagenarian in connection with two

13    annuities she purchased in 1999.

14    53.    To fund the purchase of the new annuities, the septuagenarian sold the two annuities

15    she purchased in 1999. To that end, Mondschein provided a signature guarantee on the female

16    septuagenarian's previously purchased annuities to effectuate the transaction.

17            *2.     April 2003 Sale of "Leads" to Eagle Trust Group, LLC*

18    54.    In April 2003, Mondschein sold for $2,000 the confidential personal information of 45

19    of his customers to Eagle Trust Group, LLC, an Arizona-based insurance agency. The 45 individuals

20    were Arizona residents for whom Mondschein had previously provided securities liquidation

21    services. Eagle Trust held licenses to sell insurance in Arizona.

22    55.    As with all of his leads sales, Mondschein instructed the insurance agency to make the

23    check payable to UNCI. The memo line of the April 18, 2003 check from Eagle Trust, which was in

24    the amount of $2,000, stated that the payment was for "Lead Generation."

25    56.    On April 28, 2003, a two-page multi-column list of names of the 45 leads was faxed to

26    Eagle Trust Group at Mondschein's instruction. The fax cover page, which was sent from a Kinko's

27    store in San Leandro, California, stated "Good luck and make lots of money!"

28

COMPLAINT                                    -10-

57. The list of names included a substantial amount of confidential personal information on each lead. Specifically, Mondschein provided the person's name, address, phone number, the amount the person had invested in a previous annuity, the insurance company that issued the previous annuity, the insurance agent that sold the previous annuity, the date of the previous annuity sale, and the person's state of residence.

58. At least one of the leads Mondschein sold to Eagle Trust Group held a brokerage account with WFG. This one lead had opened a brokerage account with WFG in November 2001.

### 3. *Mondschein's August 2003 Securities Liquidation Transaction Based on Successful Lead Sold to Senior Insurance Marketing*

59. In certain instances, Mondschein's leads proved successful, and the lead used Mondschein to liquidate more securities to fund the purchase of new annuities. When this happened, Mondschein reaped illegal profits at each step of this "roundtrip" transaction – he was paid a fee by the insurance agent for the successful lead and collected a brokerage commission from the lead in liquidating the securities.

60. For example, sometime prior to late August 2003, Mondschein sold the confidential personal information of a male Texas-based septuagenarian to Senior Insurance Marketing, Inc., a Texas-based insurance agency. Thereafter, Senior Insurance sold an annuity to the Texas septuagenarian, who in turn used Mondschein to liquidate securities to fund the purchase.

61. The Texas septuagenarian had been a brokerage customer of Mondschein and WFG since November 2002, when the septuagenarian used Mondschein's securities liquidation services to fund the purchase of an annuity sold by Abio Financial. After that first purchase, the septuagenarian maintained a brokerage account at WFG, with Mondschein as his registered representative.

62. To fund the second annuity purchase, the Texas septuagenarian sold $109,434.12 worth of securities held in his WFG brokerage account with Mondschein. Mondschein collected a brokerage commission of approximately $1,100 on the securities sales.

63. Unlike prior transactions, where the insurance agent paid Mondschein on a per-lead basis, Senior Insurance paid Mondschein a two percent kickback of the total amount that the lead invested in a new annuity. The October 13, 2003 check from Senior Insurance to UNCI was in the

COMPLAINT                                    -11-

1    amount of $2,188.68 – **exactly** two percent (to the penny) of the total amount that the septuagenarian

2    invested ($109,434.12) in the annuity. UNCI internal documentation likewise shows that the

3    $2,188.68 paid for the lead was calculated by taking two percent of the total value of the annuity.

4    The internal document also contains a reference to the eight-digit policy number of the annuity.

5                    *4.    May/June 2004 Sales of "Leads" to D&S Financial, Inc.*

6        64.    In May and June of 2004, Mondschein sold the confidential personal information of

7    least 75 customers to D&S Financial, Inc., a California-based insurance agency. D&S held a license

8    to sell insurance products in California. All of these leads were California residents.

9        65.    D&S paid more than $11,000 for the leads, which consisted of the name, address, and

10   phone numbers of certain California residents for whom Mondschein had previously provided

11   securities liquidation services.

12       66.    D&S paid for the leads with two separate checks payable to UNCI, and both checks

13   referenced that the payments were made for "leads." The memo line of the May 26, 2004 check,

14   which was in the amount of $4,362.46, stated: "Leads – Thanks." The memo line of the June 9, 2004

15   check, which was in the amount of $7,293.47, stated: "Thanks Leads."

16                *5.    Mondschein's July 2004 Securities Liquidation Transaction Based on*

17                       *Successful Lead Sold to Senior Insurance Marketing*

18       67.    In 2004, Mondschein again sold the confidential personal information of another of his

19   WFG customers to Senior Insurance. The lead, a female Texas-based octogenarian, subsequently

20   purchased a new annuity. Yet again, the successful lead used Mondschein to liquidate securities to

21   fund the new annuity, and Mondschein reaped illegal profits on both ends of this "roundtrip"

22   transaction.

23       68.    The Texas octogenarian had been a brokerage customer of Mondschein since at least

24   February 2000, when she used Mondschein to provide securities liquidation services in connection

25   with an annuity purchase. Starting in at least January 2001, the octogenarian held a brokerage

26   account at WFG with Mondschein as her registered representative. By the summer of 2004, the

27   octogenarian had substantial holdings in her brokerage account at WFG.

28

1     69.    Sometime prior to June 14, 2004, Mondschein sold confidential personal information

2  about the Texas octogenarian to Senior Insurance. Thereafter, Senior Insurance sold an annuity to the

3  Texas octogenarian, who in turn used Mondschein to liquidate securities to fund the purchase.

4     70.    To that end, on June 14, 2004, the Texas octogenarian directed Mondschein to sell

5  $355,439.67 worth of securities held in her WFG brokerage account. Mondschein collected

6  brokerage commissions of approximately $3,000 on these securities sales.

7     71.    As with the prior successful lead sale to Senior Insurance, Mondschein was paid a two

8  percent kickback of the total amount that the lead invested in a new annuity. The July 12, 2004 check

9  from Senior Insurance to UNCI was in the amount of $7,108.78 – **exactly** two percent (to the penny)

10  of the total amount that the female octogenarian invested ($355,439.67) in the new annuity.

11          **6.**    ***August 2004 Sale of "Leads" to Charles Huechtker***

12     72.    In August 2004, Mondschein sold the confidential personal information of at least four

13  of his customers to Charles M. Huechtker, a Texas-based insurance agent. All of these persons were

14  Texas residents. Huechtker was licensed to sell insurance in Texas.

15     73.    In exchange for $500, Mondschein provided Huechtker with the name, address, and

16  phone number for at least four persons for whom he had previously provided securities liquidation

17  services.

18     74.    Consistent with the practice followed with all of the lead sales, the check was payable

19  to UNCI and the insurance agent wrote on the face of check that the payment was for leads.

20  Specifically, the August 12, 2004 check from Huechtker for $500 stated in the memo line that the

21  payment was for "Lead Generation."

22          **7.**    ***April 2005 Sale of "Leads" to Ordained Planning and Safe Money, Inc.***

23     75.    In April 2005, Mondschein sold for a total of $3,600 the confidential personal

24  information of twelve of his WFG customers to Ordained Planning and Safe Money, Inc., both

25  Kansas-based insurance agencies. Ordained and Safe Money were joint-venture partners and held

26  licenses to sell insurance in Kansas. All twelve of the "leads" were Kansas residents for whom

27  Mondschein had previously provided securities liquidation services.

28

COMPLAINT                    -13-

76.     On April 22, 2005, UNCI issued separate invoices to Ordained Planning and Safe Money, Inc. for the purchase. Each invoice stated that insurance agent was purchasing "18 Kansas leads," at a rate of $100.00 per lead, for a total of $1,800.

77.     On the afternoon of April 21, 2005, Mondschein faxed a one-page multi-column list from his WFG office to Ordained and Safe Money. Mondschein excluded any WFG or other cover sheet from the fax. The one-page multi-column list contained the confidential personal information (the name, address, and phone number) of ten persons for whom Mondschein had previously provided securities liquidation services and had been WFG brokerage customers.

78.     Thereafter, Mondschein orally provided Ordained and Safe Money with the name, address, and phone number of two additional persons for whom Mondschein had previously provided securities liquidation services. These two individuals held existing WFG brokerage accounts at the time of the leads sales. Mondschein never provided the final six leads for which Ordained and Safe Money had paid.

79.     Ordained and Safe Money ultimately sold annuities to the same two persons who held existing WFG brokerage accounts at the time of the leads sales. One sold several annuities to buy the new one, and Mondschein provided a signature guarantee on those previously purchased annuities.

80.     The other person sold money market shares held in his WFG brokerage account, with Mondschein as his registered representative, to fund his new annuity purchase.

### 8.     *August 2005 Sale of "Leads" to Senior Insurance*

81.     Sometime in late July 2005, Mondschein sold for approximately $11,000 the confidential personal information of at least 200 Texas residents to Senior Insurance. Mondschein had previously provided securities liquidation services to all of the "leads."

82.     Mondschein faxed Senior Insurance a multi-column list containing the person's name, address, phone number, the insurance company that issued the person's previous annuity, and the insurance agent that sold the previous annuity.

83.     Senior Insurance wrote UNCI two separate checks totaling more than $11,000 to pay for the leads. On August 1, 2005, Senior Insurance wrote a check to UNCI for $4,800, and on August 5, 2005, Senior Insurance wrote a check to UNCI for $6,662.

1        84.     As an initial matter, Senior Insurance's office manager contacted each of the leads to

2  determine whether they would be interested in purchasing an annuity sold to them by Senior

3  Insurance. During these initial telephone solicitations, Senior Insurance informed the leads that it

4  was associated with Mondschein and WFG, and claimed to have new and better annuity products to

5  offer. In fact, Senior Insurance was not associated with Mondschein or WFG.

6        85.     One lead complained to Mondschein about Mondschein's providing Senior Insurance

7  with the lead's personal information. Around the same time, Mondschein learned of the

8  Commission's investigation into his securities liquidation business. As a result, Mondschein

9  contacted the principal of Senior Insurance and instructed him to direct his staff to cease all reference

10  to Mondschein or his broker-dealer firm when soliciting the leads. The reason Mondschein offered

11  for this change was that Mondschein's customers had all received privacy notices stating that he

12  would not give their information to an outside party.

13        *C.*     *Mondschein Made False and Misleading Representations to his Securities*

14             *Liquidation Customers*

15        86.     Mondschein never disclosed to any of his customers that he intended to sell, and did

16  sell, their confidential personal information to insurance agents. The personal information

17  Mondschein sold was confidential and not publicly available. The release of the leads' confidential

18  personal information to insurance agents was not authorized. None of the insurance agents who

19  bought leads from Mondschein were affiliated, in any way, with WFG.

20        87.     In the account application forms described earlier, Mondschein expressly represented

21  that "the insurance agent who has signed below is not affiliated in any way with [Mondschein's

22  broker-dealer firm] nor Sidney Mondschein . . . [and] no fees or payments of any kind will be paid or

23  received by or between Sidney Mondschein and the insurance agent and/or the [insurance]

24  company/agency below."

25        88.     Contrary to Mondschein's representations, the insurance agents – all of which

26  Mondschein had already established securities-liquidation referral relationships – compensated

27  Mondschein for selling them his customers' confidential personal information. Moreover, in certain

28

1 | instances, insurance agents paid Mondschein a two percent kickback of the total amount that a lead
2 | invested in a new annuity.

3 |     89.    The account application forms also contained explicit representations that WFG and
4 | Mondschein would maintain the confidentiality of personal information provided by the customer. In
5 | particular, an identification form that Mondschein supplied stated that WFG is "a financial institution
6 | as defined by the Bank Secrecy Act" and that "[t]he responses from the above [customer] are
7 | confidential information and will not be shared with others unless required by law." Mondschein's
8 | sale of the confidential personal information of his customers to insurance agents was contrary to the
9 | confidentiality representations in the application form.

10 |     90.    All of the individuals for whom Mondschein provided securities liquidation services
11 | were "consumers" as defined by Regulation S-P, which prohibits the unauthorized disclosure of
12 | nonpublic personal information about consumers to nonaffiliated third parties.

13 |     91.    Privacy notices were given to all of Mondschein's securities liquidation customers,
14 | except for those to whom Mondschein only provided a signature guarantee. These privacy notices
15 | were created in accordance with Regulation S-P and identified the instances in which the firm or its
16 | brokers, like Mondschein, could disclose personal information about its customers to third-parties.

17 |     92.    WFG's initial and annual privacy notices defined personal information as, among
18 | other things, "information that persons provide to [the broker-dealer] on applications and other forms
19 | (such as [their] name, address, occupation, assets, and income) and information about the client's
20 | transactions with [the broker-dealer], its affiliates, or other parties." The broker-dealer firm's
21 | definition of "personal information" covered the exact information that Mondschein's customers
22 | provided to him in order to avail themselves of his securities liquidation services.

23 |     93.    In these privacy notices, WFG stated that the only potential disclosure of such
24 | personal information by the firm or its employees to nonaffiliated third parties would be either (i) to
25 | financial service institutions, including insurance agencies, with which WFG had joint marketing
26 | agreements; or (ii) companies under contract to perform services for or on behalf of WFG. WFG had
27 | no such agreements with any of the insurance agents that purchased "leads" from Mondschein, nor
28 |

COMPLAINT             -16-

1 did any of those insurance agencies have any contractual arrangements to perform services on behalf
2 of WFG.

3    **D.    *Mondschein Concealed His Leads-Selling Business From WFG and the NASD***

4    94.    In every instance, Mondschein directed the insurance agents to make their "leads"
5 checks payable neither to him personally, nor to WFG, but rather to UNCI. Further, despite the fact
6 that Mondschein's wife was UNCI's purported principal, none of the insurance agents who purchased
7 leads from Mondschein ever met or spoke to his wife. Instead, the insurance agents dealt solely with
8 Mondschein with respect to anything related to their leads purchases.

9    95.    Despite WFG's policy that its registered representatives disclose to the firm any
10 outside business activities and dealings, Mondschein made no disclosure concerning UNCI to WFG.

11    96.    In fact, WFG required its registered representatives to complete, on an annual basis, a
12 compliance questionnaire. This compliance questionnaire required registered representatives to
13 accurately answer a series of questions about, among other things, any outside business activities in
14 which they were engaged.

15    97.    In Mondschein's compliance questionnaire dated May 27, 2004 – at a date by which
16 he had been selling leads through UNCI for almost eighteen months – Mondschein was asked
17 whether (i) he served as an officer, director, or employee of another business organization or (ii) he
18 engaged in any other outside activity for compensation other than passive income. Mondschein
19 falsely answered "No" to both of these questions.

20    98.    In addition, Mondschein was required, under the rules of his broker-dealer regulator,
21 the NASD, to disclose any outside business activities on his broker-dealer registration document,
22 called the Form U-4. Mondschein never, on any of his Form U-4s, disclosed UNCI's existence to the
23 NASD.

24 **III.    *Mondschein's Leads-Selling Scheme Unravels***

25    99.    Ultimately, Mondschein's leads selling scheme unraveled. In the summer of 2005,
26 Mondschein learned of the Commission investigation into his securities liquidation business.
27 Thereafter, Mondschein attempted to dissolve UNCI by a board resolution. However, that resolution
28

COMPLAINT                                    -17-

1  did not effectively dissolve the corporation because UNCI failed to make the required filings with the

2  State of California and engage in the necessary steps to wind down the corporation.

3  ### FIRST CLAIM FOR RELIEF

4  **Securities Fraud**

5  **(Violations of Exchange Act Section 10(b) and Rule 10b-5)**

6       100.    The Commission realleges and incorporates by reference paragraphs 1 through 99.

7       101.    By engaging in the acts and conduct alleged above, Mondschein, acting knowingly or

8  recklessly, directly or indirectly, in connection with the purchase or sale of a security, by use of

9  means or instrumentalities of interstate commerce, of the mails, or the facilities of a national

10  securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue

11  statements of material fact or omitted to state a material fact necessary in order to make the

12  statements made, in the light of the circumstances under which they were made, not misleading; or

13  (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or

14  deceit upon other persons.

15       102.    By reason of the foregoing, Mondschein violated Section 10(b) of the Exchange Act

16  [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

17  ### SECOND CLAIM FOR RELIEF

18  **False Initial Privacy Notices**

19  **(Aiding and Abetting Violations of Rule 4(a) of Regulation S-P)**

20       103.    The Commission realleges and incorporates by reference Paragraphs 1 through 102.

21       104.    As a result of the conduct alleged above, WFG violated of Rule 4(a) of Regulation S-

22  P, which requires a broker-dealer to provide accurate disclosures of its privacy policies and practices

23  to its customers and consumers.  Because WFG's initial privacy notices contained no disclosure

24  about Mondschein's sale or intended sale of, or practice of selling, his customers' confidential

25  personal information to insurance agencies, WFG violated Rule 4(a) of Regulation S-P.  In addition,

26  because Mondschein's disclosure of WFG's consumers' confidential personal information to

27  insurance agencies was not authorized, WFG violated Rule 4(a) of Regulation S-P.

28

1    105.    Mondschein knew that his conduct was improper and substantially assisted the

2    conduct at issue.  By engaging in the acts and conduct alleged above, Mondschein aided and abetted

3    WFG's violations of Rule 4(a) of Regulation S-P [17 C.F.R. § 248.4(a)].

4    ### THIRD CLAIM FOR RELIEF

5    **False Annual Privacy Notices**

6    **(Aiding and Abetting Violations of Rule 5(a) of Regulation S-P)**

7    106.    The Commission realleges and incorporates by reference Paragraphs 1 through 105.

8    107.    As a result of the conduct alleged above, WFG violated Rule 5(a) of Regulation S-P,

9    which provides that a broker-dealer must provide an accurate annual privacy notice to its customers.

10    Because the annual privacy notice of WFG contained no disclosure about Mondschein's sale or

11    intended sale of, or practice of selling, his customers' confidential personal information to insurance

12    agencies, WFG violated Rule 5(a) of Regulation S-P.

13    108.    Mondschein knew that his conduct was improper and substantially assisted the

14    conduct at issue.  By engaging in the acts and conduct alleged above, Mondschein aided and abetted

15    WFG's violations of Rule 5(a) of Regulation S-P [17 C.F.R. § 248.5(a)].

16    ### FOURTH CLAIM FOR RELIEF

17    **Unauthorized Disclosure of Non-Public Personal Information**

18    **(Aiding and Abetting Violations of Rule 10(a)(1) of Regulation S-P)**

19    109.    The Commission realleges and incorporates by reference Paragraphs 1 through 108.

20    110.    As a result of the conduct alleged above, WFG violated Rule 10(a)(1) of Regulation S-

21    P, which provides that a broker-dealer may not disclose nonpublic personal information about a

22    consumer to a nonaffiliated third party unless the broker-dealer has provided the consumer with

23    advance notice of the disclosure as well as an opportunity to opt out of the disclosure, and the

24    consumer has declined the opportunity.  Because Mondschein's customers were not provided with

25    advance notice and did not authorize the disclosure of their confidential personal information to

26    insurance agencies, WFG violated Rule 10(a)(1) of Regulation S-P.

27

28

1   111.   Mondschein knew that his conduct was improper and substantially assisted the

2   conduct at issue. By engaging in the acts and conduct alleged above, Mondschein aided and abetted

3   WFG's violations of Rule 10(a)(1) of Regulation S-P [17 C.F.R. § 248.10(a)(1)].

4                                  **PRAYER FOR RELIEF**

5       WHEREFORE, the Commission respectfully requests that the Court:

6                                          I.

7       Permanently enjoin defendant Mondschein from violating, directly or indirectly, Section

8   10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-

9   5].

10                                         II.

11      Permanently enjoin defendant Mondschein from aiding and abetting violations of Rules 4(a),

12   5(a), and 10(a)(1) of Regulation S-P [17 C.F.R. §§ 248.4(a), 248.5(a) and 248.10(a)(1)].

13                                        III.

14      Order defendant Mondschein to provide an accounting and disgorge his ill-gotten gains in an

15   amount according to proof, plus prejudgment interest thereon.

16                                        IV.

17      Order defendant Mondschein to pay civil money penalties pursuant Section 21(d)(3) of the

18   Exchange Act [15 U.S.C. § 78u(d)(3)].

19                                         V.

20      Order relief defendant UNCI to disgorge its ill-gotten gains in an amount according to proof,

21   plus prejudgment interest thereon.

22                                        VI.

23      Retain jurisdiction of this action in accordance with the principles of equity and the Federal

24   Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that

25   may be entered, or to entertain any suitable application or motion for additional relief within the

26   jurisdiction of this Court.

27                                        VII.

28      Grant such other and further relief as this Court may deem just, equitable, and necessary.

1 | **DEMAND FOR JURY TRIAL**

2 | The Commission hereby demands a jury trial.

3 |

4 |

5 | Dated: December 6, 2007

6 | Respectfully submitted:

7 |

8 |

9 | By: _____
    Robert W. Pommer III
    Cheryl J. Scarboro
10 | Charles J. Felker
    James Lee Buck, II
11 | Ricky Sachar

12 | Attorneys for Plaintiff
    SECURITIES AND EXCHANGE COMMISSION
13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |